UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER M. LYN<br><br>Plaintiff,<br><br>-against-<br><br>MOUNT SAINT MARY COLLEGE, Dr. ROBERT GERVASI, SHANE BELL, ELAINE O'GRADY, MICHAEL LOWELL, and SAMANTHA HOWE.<br><br>Defendants | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Christopher Lyn, by his attorneys, Cooper Erving & Savage LLP, complains of Defendants as follows:

## PRELIMINARY STATEMENT

1. This is a race discrimination and retaliation action brought pursuant to Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991; and parallel provisions of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §290 et seq.

2. Plaintiff Christopher Lyn ("Plaintiff" or "Lyn"), formerly employed as Head Coach of the Women's Soccer team at Mount Saint Mary College, brings this action against the College for race discrimination and retaliation based on his advocacy against racial discrimination in the student body.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as Defendant violated Plaintiff's federal rights under Section 1981 and Title VII.

4. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL claims as they are so related to the Section 1981 and Title VII claims that they form part of the same case or controversy.

1

5.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## PARTIES

6.      Plaintiff, at all times relevant hereto, was and is a resident of Dutchess County in the State of New York.

7.      Upon information and belief, at all times relevant hereto, Defendant Mount Saint Mary College is located at 330 Powell Avenue, Newburgh, New York 12550.

8.      Upon information and belief, Defendant Robert Gervasi is the President of the Defendant Mount Saint Mary College.

9.      Upon information and belief, Defendant Shane Bell is the Athletic Director of the Defendant Mount Saint Mary College.

10.     Upon information and belief, Defendant Elaine O'Grady is the Vice President for students of the Defendant Mount Saint Mary College.

11.     Upon information and belief, Defendant Michael Lowell is the Assistant Athletic Director of the Defendant Mount Saint Mary College.

12.     Upon information and belief, Defendant Samantha Howe is the Associate Athletic Director and Senior Woman Administrator of the Defendant Mount Saint Mary College.

## FACTUAL BACKGROUND

13.     Plaintiff Christopher Lyn was employed as Head Coach of the Women's Soccer team at Mount Saint Mary College (the "College") from 2016 through September 30, 2024, when his employment was terminated by the College.

14.     Coach Lyn is an extremely accomplished athlete and soccer coach. He was a member

2

of the U.S. Youth National Team. Prior to becoming a coach, Lyn was the captain of The University of North Carolina-Chapel Hill men's soccer team, where he was named All-American athlete. He also played professionally for the USISL Raleigh Flyers and the Greensboro Dynamo soccer teams.

15. He began his career as an assistant coach for the Iona College women's soccer program from 1993-2003. From 2003 to 2007, Coach Lyn was the Head Women's Soccer Coach for Molloy College. In 2007, he became the Assistant Women's Soccer Coach at Columbia University, where he stayed until 2011.

16. From 2011 to 2013, Lyn was the Assistant Women's Soccer Coach at Marist College, and part of the winningest single-season in Marist women's soccer history in 2011. From 2013 to 2016, Lyn was the Head Men's Soccer Coach at The Culinary Institute of America, before he became the Head Women's Coach for Defendant's Women's Soccer program in 2016.

17. As the Head Women's Soccer coach for the College, Lyn was named the Coach of the Year in 2017. Previously, Coach Lyn was named Hudson Valley Intercollegiate Athletic Conference Coach of the Year in 2014, Eastern New York State Soccer Association-Girls Competitive Coach of the Year in 2012, and Molloy College-East Coast Conference Coach of the Year in 2007.

18. During his tenure as Head Coach, Lyn led the College's Women's Soccer program to the playoffs for seven (7) consecutive years until the termination of his employment on September 30, 2024.

19. Lyn's soccer program was the most diverse and academically accomplished sports program at the College.

20. At the conclusion of the 2023-2024 soccer season in the Fall 2023, Coach Lyn's Women's Soccer Team achieved the following milestones:

    a. Team with the highest GPA in the Athletic Department (GPA median 3.6);

    b. Skyline Conference record 6-2-3 (Top 6 finish making playoffs for the 7th year in a row);

3

c. Program with the most student-athletes recruited in the Athletic Department;

d. Team to raise the most money during the "Go Blue" campus wide fundraiser ($19,000 in 10 days);

e. Winner of the Campus Wide Fundraiser for the College earning an additional $10,000 bonus from the College's Advancement Office for the most money raised during the Go Blue fundraising campaign

**Protected Activity**

21. On or about January 30, 2023, Coach Lyn was informed that two students A.D. and C.B. had accused him of "fat shaming" a student named "M.S.", who was also a soccer player on Coach Lyn's soccer team.

22. The allegations were investigated by Athletic Director Drew Brown. He interviewed A.D., C.B., and M.S., as part of his investigation. AD Brown told Coach Lyn that A.D. and C.B. were under investigation and they were suspended from the soccer team until the investigation was complete. The investigation revealed that A.D. and C.B.'s allegations were false, that Coach Lyn had never disrespected any student, and that the members of the women's soccer team held Coach Lyn in high regard.

23. During the investigation, AD Brown asked M.S. if she had any other complaints about Coach Lyn. She stated she did not.

24. After her meeting with AD Brown, student M.S. confided in Coach Lyn her discomfort with AD Brown's questions, which she felt were biased against Coach Lyn.

25. M.S. also told Coach Lyn that the reason why A.D. and C.B. would make false allegations against him was because "they are racist." This was the first time that Coach Lyn learned that his race was a factor in the complaints being made against him at the College.

26. In or about February 2023, two other athletes informed Coach Lyn that A.D. and C.B.

4

were making racially discriminatory remarks in their dormitory. The discriminatory remarks included the indiscriminate use of the word "Nigger" to refer to African Americans and "Spic" to refer to Hispanics.

27. Coach Lyn instructed the students to report the incidents to Residential Life, Campus Security, and the Athletic Director, Drew Brown, which the students did. Coach Lyn also sent an email to the College's administration dated February 12, 2023 stating: "I would like to let you all know that some students have come forward expressing some very serious racial issues that have been shared with me."

28. On the following day, AD Brown notified Coach Lyn that a complaint was filed against two of his student-athletes, that an investigation was in progress, and that the students had been suspended until the investigation was completed.

29. After the investigation, AD Bown told Coach Lyn that the A.D. and C.B. had also made racially discriminatory statements against Coach Lyn.

30. Upon information and belief, A.D. and C.B. stated that they did not want to touch Coach Lyn's "sweaty black hands" and that "Coach's black hands creep them out."

31. In February 2023, Coach Lyn was the only African American head coach employed by the College.

32. In February 2023, Coach Lyn met with Sharnie Canary (Director of Human Resources), Alisah Williams-McCorvey (Assistant Vice President and Title IX Coordinator), Jenifer Lee-Gonyea (Assistant Vice-President of Diversity, Equity, and Inclusion ("DEI") and Chief Diversity Officer, and Samantha Howe (Senior Woman Administrator) to express his concerns regarding racial discrimination and to request a meeting on the subject.

33. At Coach Lyn's request, the College's Vice-President, Elaine O'Grady, and Title IX Coordinator, Ms. Williams-McCorvey met with Coach Lyn to discuss his concerns.

5

34. During their meeting, the College's representatives offered support to Coach Lyn and the players affected by the discriminatory comments made by their teammates.

35. As of the date of Coach Lyn's termination in September 2024, The College made no effort to offer Coach Lyn and/or his affected players any type of support.

36. In or about June 2023, the investigation was completed.

37. The investigation concluded that the students had violated the College's and the Athletic Department's codes of conduct by making racially discriminatory statements. As a result, A.D. and C.B. were placed on probation by the College's office of Residence Life until December 31, 2023.

38. Following the investigation, AD Brown contacted Coach Lyn to ask him if A.D. and C.B. could return to his soccer team, since they were both players on Coach Lyn's team. AD Brown opined that these students should be given a second chance despite the findings of the investigation that they had made racially discriminatory statements against Coach Lyn and their teammates. AD Brown suggested a 2-game suspension to the offending students.

39. Coach Lyn disagreed with AD Brown's recommendation. He explained that his team had several minority players, who were deeply offended and emotionally distraught by A.D. and C.B.'s conduct. For example, one of his players told Coach Lyn that she would not allow her friends to visit her at the College because of the racially discriminatory comments from students in her dorm.

40. As a result, Coach Lyn suggested that the subject students should be removed from the soccer team.

41. AD Brown did not accept Coach Lyn's recommendation.

42. AD Brown sought input from Coach Lyn's players as to what penalty A.D. and C.B. should receive.

43. Upon information and belief, the players interviewed agreed that returning A.D. and

6

C.B. to the team would be detrimental to the team.

44. As a result, AD Brown expelled A.D. and C.B. from the College's Women's Soccer Team.

**Evidence of Discriminatory Intent and Retaliation**

45. After the College announced the penalty for A.D. and C.B.'s violations, Coach Lyn's terms and conditions of employment changed significantly.

46. Following the decision to expel A.D. and C.B. from the Women's Soccer Team, Coach Lyn was given additional responsibilities, which he did not have during the prior seven (7) years of his tenure as a Head Coach with the College.

47. AD Brown assigned Coach Lyn the title of Community Service Coordinator for Athletics, in addition to his coaching responsibilities. As Community Service Coordinator, Coach Lyn was required to coordinate, supervise, and schedule the Newburgh Armory Unity Center Saturday Program. This was a 10-week academic support program for both the fall and spring semesters. The role also required Lyn to gather and record the community service participation for each athletic program for the year, to act as the liaison for community service opportunities within the Athletic Department and/or outside organizations, and to attend off campus activities and meetings. Such assignments changed Coach Lyn's job responsibilities by increasing the number of phone calls, emails and additional administrative work other coaches were not assigned or required to complete.

48. No other coach in the College had ever been assigned the title of Community Service Coordinator for Athletics before Coach Lyn. Such responsibility was previously shared by all head coaches, who would report their own team's community service activities directly to the Athletic Director and/or Assistant Director.

49. Coach Lyn was also appointed as a member of the Diversity, Equity, and Inclusion ("DEI") committee. As a member of the DEI committee, Coach Lyn was required to attend DEI

7

committee meetings and additional Athletic Department DEI meetings, report DEI information to the Athletic Director, and create DEI opportunities for the Athletic Department in addition to his coaching responsibilities.

50. Upon information and belief, during Coach Lyn's tenure with the College, no other head coach had ever been assigned this additional responsibility before Coach Lyn.

51. Coach Lyn was also given the responsibility to order and change printer ink and paper from his office building. Such tasks had always been the responsibility of the Athletic Department Administrative Assistant prior to being assigned to Coach Lyn.

52. Coach Lyn was not offered any additional compensation to perform these additional job duties assigned to him after July 2023.

53. Coach Lyn continued to be assigned these additional responsibilities up until the time that he was terminated in September 2024.

54. In or about November 2023, AD Brown resigned from his position.

55. In January 2024, the College appointed Shane Bell as the College's new Athletic Director. At the time of his appointment, AD Bell had less than one year of experience in the Athletic Director's office at Mount Saint Mary's.

56. During the 2023-2024 soccer season, Coach Lyn had another successful soccer season with his team reaching the playoffs once again.

57. The College's academic year ended on May 21, 2024.

58. On or about June 11, 2024, AD Bell met with Coach Lyn to discuss concerns that he had related to recruiting charges and compensation spent by Coach Lyn's Assistant Coach, Liz Cusato.

59. This was the first time that Coach Lyn was ever notified about concerns involving his assistant coach's recruiting charges.

60. On June 12, 2024, AD Bell wrote to Coach Lyn about Ms. Cusato's recruiting related

8

expenses for the period from November 2023 through May 2024 and his suggestion as to what the budget for recruiting should be for the upcoming season. Specifically, AD Bell wrote:

> Chris –
>
> As a follow up to our conversation regarding Liz Cusato yesterday, here is a summary of the recruiting charges issue and the total amount of money she's been paid this year.
>
> - **Recruiting Charges:** Here are Liz's recruiting related charges from November 2023 thru May 2024:
>   - **Food:** $921.37
>   - **Hotels:** $4,643.78
>   - **Flights:** $680.60
>   - **Misc.:** $432.51
>   - **Total:** $6,678.26
>
> As mentioned previously, the entire budget for the department is $38,000 for the year so this represents 16% of that. Moving forward, as mentioned in the travel policy, all hotel stays and flights will need to be approved by me prior to booking them and the expectation is that they are affordable and the hotel comes with complimentary breakfast. *Additionally, until I have more data so I can analyze the department's yearly spending habits, I would like for each of our teams to spend between $2,500-$3,000 a year on recruiting.*
>
> - **Salary:** Per the agreement that Liz signed, her position was to be paid $15,600.00 for the 2023-2024 season. As of yesterday, Liz had been paid $21,374.61. With the minimum wage rates increasing in New York on January 1, 2025, the agreed upon rate for Liz is no more than $18,250.00 for the 2024-2025 season ($10,500.00 from 7/1/24-12/31/24 and $7,750.00 from 1/1/25-6/30/25). As stated yesterday, while $18,250.00 is the maximum amount of money we will pay Liz, my preference would be to fall well under that number.
>
> Lastly, as discussed, if you could please email Liz with what the expectations are and please cc me on the email. My expectation, as we continue through the year, is that you continue to monitor this and provide guidance needed to ensure that we stay within parameters listed above. Please let me know if you have any questions or concerns.
>
> (Italicized added; underlines in the original)

61. Liz Cusato became Coach Lyn's assistant coach in July 2018.

9

62. Upon information and belief, Ms. Cusato entered into an employment agreement with the College to act as Assistant Coach of the Women's Soccer program.

63. As the Women's Soccer team assistant coach, Ms. Cusato was responsible for assisting Coach Lyn in all aspects of the program including but not limited to recruiting, fundraising, scheduling, academic support, budgets, and any additional extra duties.

64. When soccer season was over, Ms. Cusato performed additional work for the College, including working at the stat panel (scorer's table) for both the College's Men's and Women's Basketball home games and the stat panel for the Section IX High School Boys and Girls Basketball Championships hosted at the College.

65. As Head Coach, Coach Lyn was responsible to supervise the assistant coach in all aspects of the Women's Soccer program. Coach Lyn was not responsible to supervise the work Ms. Cusato performed for the College in any capacity outside her role as an assistant coach for the Women's Soccer Program.

66. Coach Lyn was unaware of terms and conditions of Ms. Cusato's employment agreement with the College, including Ms. Cusato's compensation until AD Bell's June 12, 2024 email.

67. Before June 12, 2024, Coach Lyn had never been informed nor were concerns ever raised about Ms. Cusato's recruiting costs or compensation.

68. On June 21, 2024, Coach Lyn wrote the following to AD Bell:

> Hi Shane,
>
> Liz went home to help her parents move from her childhood home so I have not spoken with her yet. Since this is an important matter I want to speak with her face to face and answer any questions she may have to hopefully alleviate and (sic) misrepresentations. Liz will return to campus on Monday so I plan to speak with her then. Is that ok? Just let me know when possible.
>
> Thank you,
> Chris

10

69. AD Bell agreed with Coach Lyn's suggestion for a face-to-face conversation with Assistant Coach Cusato, but asked that the communication be memorialized in writing. AD Bell wrote the following to Coach Lyn on June 27, 2024:

> Chris –
>
> Following up on this, please let me know what your timeline is for your email to Liz with me cc'd. Fiscal responsibility is something I'm focusing on and it will be something that all coaches will be evaluated on stating this year. With Liz's consistent spending issues while recruiting coupled with the fact that we have gone way over budget on her salary, your attention to this matter is appreciated.
>
> I have no problem setting up my own meeting with Liz if that is easier for you. Please let me know your thoughts.

70. On July 3, 2024, Coach Lyn sent the following email to AD Bell:

> Hi Shane,
>
> I emailed Liz and cc'd you today. The conversation I had with Liz was clear and addressed the recruiting budget and her salary. She seemed to completely understand and did not have any questions at the time. I let her know that we are available to speak with her further or answer any questions she may have.
>
> Please let me know if you have any questions.
>
> Thank you,
> Chriss

71. In August 2024, Coach Lyn was notified that a student athlete on his team ("A.W.") was placed on academic probation. The student had completed summer classes and was waiting on her grades.

72. At the time, the College had no clear rules involving athletes who were on academic probation. In an email to Coach Lyn dated August 15, 2014, AD Bell stated that A.W. could submit a request to the Academic Standards Committee to change her academic standing, but that he was not optimistic that her request would be successful. As a result, AD Bell recommended that "all lean into

11

helping [A.W.]" because she was not showing signs that her grades were improving.

73. AD Bell asked Assistant Athletic Director, Michael Lowell, for clarification on the College's guidance for student-athletes on academic probation, specifically, whether student-athletes on academic probation can still be around the team.

74. On August 15, 2024, AAD Lowell wrote to AD Bell, AAD Howe, and Coach Lyn clarifying the Conference rules regarding student-athletes on academic probation. Mr. Lowell wrote:

> [A.W.] will be allowed to practice with the team until classes start, she will not be allowed to participated in the 2 scrimmages. Once classes start on the morning 8/26/2024, [A.W.] cannot practice with the team.
>
> While on probation it is encouraged to keep her engaged with the team.

75. Coach Lyn acknowledged Mr. Lowell's policy clarification and agreed that he would communicate the policy to A.W.

76. On August 28, 2024, Coach Lyn also advised A.W. that she would not be allowed to travel with the team to away games while she was on academic probation.

77. On September 30, 2024, Coach Lyn was summoned for a meeting with AD Bell and Director of Human Resources Philip Brigante.

78. During that meeting, AD Bell told Coach Lyn that his employment was being terminated unless he resigned from his position.

79. AD Bell told Coach Lyn that his employment was being terminated for the following reasons: (a) attrition with players, which resulted in the College losing 17 players; (b) he was never in his office because AD Bell never saw his car in the parking lot; (c) he mismanaged funds by failing to monitor assistant coach Cusato's spending with recruiting and her compensation during the 2023-2024 academic year; and (d) he failed to provide academic support to his student-athletes.

80. The reasons offered for Coach Lyn's termination were demonstrably false and pretextual.

81. Since Coach Lyn's termination, the College's reasons for the termination of his employment have changed numerous times, including statements from the College's legal representatives and in the College's submissions to the EEOC.

82. All reasons offered by the College are demonstrably false and contrary to prior communications with the College's representatives.

83. During Coach Lyn's 7-year tenure as the Head Coach for the College Women's Soccer Team, 17 soccer players did leave the program. However, 13 of these players left the soccer program for academic or health reasons unrelated to Coach Lyn's performance, but they remained enrolled in the College. Two (2) student-athletes left the program after being suspended for code of conduct violations after being found guilty of making racially discriminatory statements toward African Americans, including Coach Lyn. One (1) student-athlete left the College because she was homesick, and another student athlete left the College for financial reasons. Conversely, numerous student athletes from Division I programs enrolled in the College and joined Coach Lyn's program, in part, because of Coach Lyn's record of academic and athletic support to his student-athletes.

84. As of the date of his termination, Coach Lyn had recruited more than 45 student-athletes to join the College's Division III soccer program.

85. Coach Lyn's car was not always parked in the parking lot because after July 2023, some aspects of his job required him to handle matters outside campus, such as recruiting, fundraising, community service etc. Furthermore, due to weekend games, practices, and recruiting activities, Coach Lyn would often be in his office during weekends.

86. Coach Lyn's off campus activities were increased after he recommended the suspension of students for making racially discriminatory statements toward him and their teammates. During his 7 years as the Head Coach of the Women's Soccer program, Coach Lyn only missed two practices.

87. The College had no concrete limit on budget for recruiting. On June 12, 2024, when AD Bell expressed his desire to limit each team's spending between $2,500-$3,000 a year on recruiting, Coach Lyn agreed to comply.

88. Coach Lyn was terminated in September 2024, before any recruiting money was spent for the 2024-2025 calendar year.

89. The athletic and academic success of student-athletes under Coach Lyn's leadership is easily verifiable. The student athletes under Coach Lyn's tutelage held the highest medium GPA of all athletic programs in the College, which is a testament to Coach Lyn's academic support for his student-athletes.

90. At the time of Coach Lyn's termination, Coach Lyn's soccer team's record was also 3-1-1 in the Skyline Conference.

91. The termination of Coach Lyn's employment despite his record of accomplishments as a Head Coach of the College's Women's Soccer program creates the inevitable perception that he was terminated due to some serious ethical or disciplinary violation. However, neither is true.

92. At the time of Coach Lyn's termination, he had no prior record of formal or informal discipline involving him or his coaching staff.

93. Since the termination of his employment, Coach Lyn has been unable to secure another coaching job.

94. Despite Coach Lyn's record of accomplishments and professionalism, his employment was terminated for reasons that are pretextual and motivated by discrimination and retaliation.

95. On January 24, 2025, Coach Lyn filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In his complaint, Coach Lyn alleged that he was discriminated against and retaliated against on the basis of race and for advocating on behalf of students who were subject to discrimination on the basis of race.

96.　On May 5, 2025, the EEOC issued a determination and Notice of Right to Sue to Coach Lyn.

## FIRST CAUSE OF ACTION
### Wrongful Termination in Violation of Section 1981
### (Against all Defendants)

97.　Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

98.　Section 1981 prohibits employers from discriminating against an employee on the basis of race.

99.　At all times, Plaintiff was an employee of the Defendant College.

100.　At all times, Defendants Gervasi and Bell were officers of the Defendant College.

101.　At all times, Defendants College, Gervasi, and Bell were aware of Plaintiff's race, and of Plaintiff's advocacy on behalf of other minorities harassed and discriminated against on the basis of their race.

102.　By the conduct alleged, the Defendants unlawfully discriminated against the Plaintiff with respect to the benefits, privileges, terms and conditions of his employment because of his race, in violation of Section 1981 of the Civil Rights Act of 1866.

103.　Plaintiff was subjected to a pervasive hostile work environment by the Defendants' conduct.

104.　Defendant unlawfully terminated Plaintiff because of his advocacy on behalf of students who were being harassed and discriminated against because of their race.

105.　As a direct and proximate consequence of Defendants' race discrimination, Plaintiff has suffered, and continues to suffer, substantial economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

106.　Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard

of Plaintiff's federally protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

107.   Plaintiff is entitled to the attorneys' fees, costs, and disbursements incurred in this action.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of Section 1981
### (Against all Defendants)

108.   Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

109.   Section 1981 prohibits employers from retaliating against an employee for making a complaint of racial discrimination and/or for his/her advocacy on behalf of minorities resulting in Plaintiff's discharge.

110.   Plaintiff disclosed to and complained to Defendants about discriminatory comments and conduct toward him and other student-athletes on the basis of their race.

111.   Defendants retaliated against Plaintiff by subjecting him to further discrimination and harassment, changing the terms and conditions of his employment, and ultimately terminating his employment.

112.   As a direct and proximate consequence of Defendants' retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, back pay and front pay, as well as emotional distress and suffering, all in amounts to be determined at trial.

113.   Defendants' discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's federally protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

114.   Plaintiff is entitled to the attorneys' fees, costs, and disbursements incurred in this

action.

## THIRD CAUSE OF ACTION
### Race Discrimination and Retaliation in Violation of Title VII
### (Against the College Only)

115. Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

116. Defendant College was and is Plaintiff's "employer" within the meaning of Title VII.

117. Plaintiff was and is an African-American "employee" of the College and is a member of a protected class within the meaning of Title VII.

118. By the conduct alleged in the Complaint, the College discriminated against Plaintiff with respect to the terms, condition and privileges of his employment because of his race.

119. Plaintiff was subjected to a pervasive hostile work environment by the Defendants' conduct.

120. The College engaged in unlawful employment practices prohibited by Title VII because of Plaintiff's race and because of his advocacy on behalf of other minority students being harassed and discriminated against because of their race.

121. As a direct and proximate result of the College's unlawful and willful conduct, Plaintiff has suffered and will continue to suffer loss of income and damage to reputation. Plaintiff has also suffered and/or will continue to suffer future pecuniary losses, attorney's fees, disbursements, and costs, emotional and physical pain and suffering, inconvenience and other non-pecuniary losses.

122. As a further direct and proximate result of the College's unlawful and willful conduct, Plaintiff had suffered and will continue to suffer, among other things, impairment and damage to his good name and reputation, emotional distress, physical injury, mental anguish, and lasting embarrassment and humiliation.

123. Plaintiff is entitled to recover, *inter alia*, monetary damages and other damages and

relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from the College under Title VII.

## FOURTH CAUSE OF ACTION
### Race Discrimination and Hostile Work Environment in Violation of NYSHRL
### (Against all Defendants)

124. Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

125. This Count is brought under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, and reference is made to the NYSHRL in its entirety.

126. At all relevant times, the College was Plaintiff's "employer" within the meaning of the NYSHRL.

127. At all relevant times, Plaintiff was an "employee" of the College within the meaning of the NYSHRL.

128. At all times, Defendants the College, Gervais, and Bell were aware of Plaintiff's race.

129. Defendants engaged in unlawful employment practices prohibited by the NYSHRL because of Plaintiff's race in the manner described in the Factual Background above.

130. Plaintiff was severely limited in his career by Defendants' unlawful conduct due to his race and his advocacy on behalf of other minority students.

131. Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination on the basis of race as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to do so, in violation of the NYSHRL.

132. Specifically the individual defendants are liable as aiders and abettors under the NYSHRL (though there is no individual liability under Title VII).

133. Plaintiff's damages include, inter alia, financial loss, loss of employment opportunities, damage to his career and professional reputation, and severe emotional distress caused by the degrading conduct and loss of employment opportunities.

134. Plaintiff is entitled to recover monetary damages and other damages and relief, including, but not limited to, back pay, front pay, compensatory and punitive damages, and costs and attorney's fees from Defendant under the NYSHRL.

## JURY DEMAND

135. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands a judgment against Defendant as follows:

A. Issuing a declaratory judgment declaring that the actions of the Defendant, as set forth in this Complaint, violated: (i) § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; (ii) the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; (iii) the New York State Human Rights Law, N.Y. Exec. Law. § 290 *et seq.*; and (iv) that Defendant's foregoing acts of discrimination, harassment, and retaliation against Plaintiff were intentional and willful.

B. Enjoining and restraining the Defendants and all persons acting on its behalf, or in concert with them, from engaging in such unlawful discriminatory and retaliatory practices;

C. Entering judgment in favor of the Plaintiff, and against the Defendants, for back pay, front pay, and lost benefits, including, among other things, in the amount of the wages it is determined that the Plaintiff lost as a result of the Defendants' unlawful, discriminatory and retaliatory conduct, together with interest thereon;

D. Entering judgment in favor of the Plaintiff, and against the Defendants for compensatory damages, including but not limited to, damages for Plaintiff's mental anguish, humiliation, lack of self-respect, emotional and physical pain, suffering and illness, together with interest;

E.      Awarding the Plaintiff punitive damages;

F.      Awarding the Plaintiff reasonable attorney's fees, interest, and expenses together with the costs of this action;

G.      Awarding such other and further legal and equitable relief as may be appropriate to redress fully the deprivation of the Plaintiff's rights under the laws cited herein, to prevent their recurrence in the future and to protect other employees from such unlawful behavior; and

H.      Granting such other and further relief as the court deems just and proper.

Dated: June 20, 2025
Albany, New York

Respectfully Submitted,

COOPER ERVING & SAVAGE LLP

By: /s/ Carlo A. C. de Oliveira
      Carlo A. C. de Oliveira
      Bar Roll No.: 516271
      Phillip G. Steck, Esq.
      Bar Roll No.: 102664
      Attorneys for Plaintiff
      20 Corporate Woods Blvd.
      Suite 501
      Albany, New York 12211
      Telephone: (518) 449-3900
      Facsimile: (518) 432-3111
      E-mail: Cdeoliveira@coopererving.com